**UNITED STATES DISTRICT COURT**
**DISTRICT OF CONNECTICUT**

| | | |
|---|---|---|
| BLANCA R. DIAZ, | : | |
| Plaintiff, | : | CIVIL ACTION NO. |
| | : | 3:17-CV-00735 (JCH) |
| v. | : | |
| | : | |
| NANCY A. BERRYHILL, Acting | : | SEPTEMBER 18, 2018 |
| Commissioner, Social Security | : | |
| Administration, | : | |
| Defendant. | : | |

**RULING RE: MOTION TO REVERSE THE DECISION OF THE COMMISSIONER
(DOC. NO. 22) & MOTION TO AFFIRM THE DECISION OF THE COMMISSIONER
(DOC. NO. 23)**

## I.    INTRODUCTION

Plaintiff Blanca R. Diaz ("Diaz") brings this appeal under section 405(g) of title 42

of the United States Code from the final decision of the Commissioner of the Social

Security Administration ("SSA"), which denied her application for Title II disability

insurance benefits.  See generally Complaint ("Compl.") (Doc. No. 1).  Diaz seeks either

reversal or remand of the Decision rendered by Administrative Law Judge ("ALJ")

Alexander Peter Borré, which affirmed the Commissioner's denial.  See Motion to

Reverse the Decision of the Commissioner ("Mot. to Reverse") (Doc. No. 22); see also

Memorandum in Support of Plaintiff's Motion to Reverse the Decision of the

Commissioner ("Pl.'s Mem.") (Doc. No. 22-2) at 25.  The Commissioner cross-moves for

an order affirming the ALJ's Decision.  See Motion to Affirm the Decision of the

Commissioner ("Mot. to Affirm") (Doc. No. 23).

For the reasons set forth below, Diaz's Motion to Reverse the Decision of the

Commissioner (Doc. No. 22) is **GRANTED**.  The Motion to Affirm the Decision of the

Commissioner (Doc. No. 23) is **DENIED**.

1

## II.    PROCEDURAL HISTORY

Diaz applied for disability insurance benefits on October 30, 2013, alleging a disability onset date of June 24, 2013.  See Plaintiff's Proposed Statement of Facts ("Pl.'s Statement of Facts") (Doc. No. 22-1) at 1; Memorandum in Support of Defendant's Motion to Affirm the Decision of the Commissioner ("Def.'s Mem.") (Doc. No. 23-1) at 2 (adopting the procedural history as outlined in Plaintiff's Statement of Facts).  The Commissioner denied Diaz's application initially on January 28, 2014, and again upon reconsideration on September 18, 2014.  See Pl.'s Statement of Facts at 1. Diaz requested a hearing before an ALJ, which was held on January 19, 2016.  See id. Diaz was represented by counsel at the hearing, and she testified through a translator. See Certified Transcript of Record ("R.") (Doc. Nos. 14-1–14-10) at 35.  John Matzilevich, a vocational expert, also testified before the ALJ by telephone, over the objection of Diaz's attorney.  See id. at 35–36.

On February 8, 2016, ALJ Borré issued an unfavorable decision for Diaz, affirming the Commissioner's denial.  See id. at 9.  Specifically, he found that Diaz had two severe impairments, rheumatoid arthritis and major depressive disorder without psychotic features.  See id. at 18.  However, he concluded that Diaz's impairments did not meet or medically equal the severity of any listed impairment.  See id.  The ALJ further determined that Diaz had the residual functional capacity ("RFC") to perform light work, with the following additional limitations:  she could (1) occasionally climb ladders, ropes, scaffolds, ramps, and stairs; (2) occasionally balance, stoop, kneel, crouch, and crawl; (3) frequently reach overhead and finger bilaterally; and (3) perform simple and repetitive tasks in an environment with no public contact and only occasional contact with coworkers and supervisors.  See id. at 20.  On the basis of vocational expert

Matzilevich's testimony and Diaz's age, education, work experience, and RFC, the ALJ found that Diaz was not disabled because there existed a significant number of jobs in the national economy that Diaz could perform. See id. at 25.

Diaz requested review of the ALJ's Decision by the Appeals Council. See Pl.'s Statement of Facts at 2. On March 6, 2017, the Appeals Council denied the request, making ALJ Borré's Decision final and reviewable by this court. See id. Diaz then filed this appeal in federal court on April 10, 2017. See Compl. at 1.

## III. RELEVANT BACKGROUND[1]

The court assumes the parties' familiarity with the evidence of Record, and it will therefore only briefly describe the facts relevant to this opinion.

Diaz was born on November 26, 1967. See R. at 38. From 1991 to 2013, Diaz worked at a nursing home, first in the laundry department and later as a recreational therapist assisting patients with Alzheimer's disease. See id. at 41–42, 243–245. Diaz testified that arthritis and depression have prevented her from working since 2013. See id. at 43.

Diaz's treating physicians have diagnosed her with rheumatoid arthritis and major depressive disorder. See id. at 410, 730. Dr. Nicholas Formica ("Dr. Formica"), a rheumatologist at Hartford Health Care Medical Group, has treated Diaz's arthritis since at least as early as March 12, 2013. See Pl.'s Statement of Facts at 2. Dr. Victor Tirado ("Dr. Tirado"), a psychiatrist, has treated her depression since at least as early as

---

[1] Although the court's Scheduling Order (Doc. No. 15) required that the parties make a "good faith attempt to stipulate to the facts," the parties did not file a stipulation of facts. Instead, the Commissioner "generally incorporate[d] by reference Plaintiff's Statement of Facts, with the exception of any legal conclusions and inferences," and alleged additional facts not contained in Diaz's Statement of Facts. Def.'s Mem. at 2. The court will rely on the medical chronology in Diaz's Statement of Facts as if stipulated.

May 31, 2013. See id. at 3. The record also contains (1) notes from Ms. Tina Robbins ("PA Robbins"), a physician's assistant at Solano Medical Group who conducted several examinations of Diaz; and (2) notes from Dr. Robert Belniak ("Dr. Belniak"), who saw Diaz once in December 2015. See id. at 2, 4, 7, 13, 20.

Dr. Formica completed a medical source statement for Diaz on September 12, 2014. See id. at 21. In this medical opinion, he stated that Diaz suffered from several medical impairments, including rheumatoid arthritis, bilateral carpal tunnel syndrome, and pain in her cervical spine and lumbar spine. See id. at 410. As clinical evidence of these impairments, he noted that Diaz had stiffness, swelling, fluid, pain, and tenderness in her joints; redness and warmth in and around her joints; limited and decreased range of motion in her joints, particularly with respect to her knees, wrists, cervical spine, and shoulders; spasm in her cervical and lumbar spine; fatigue, malaise, and muscle weakness; and numbness and tingling in her hands. See id. Dr. Formica further indicated that Diaz had joint deformity, reduced grip strength, trigger points, and a positive straight leg raising test. See id. at 411. He opined, inter alia, that Diaz could not stand for more than 30 minutes at a time due to swollen knee and ankle joints; that she could not sit for more than 1 hour at a time due to cervical spine pain and lumbar spine pain; and that she must lie down for at least 30 minutes every three hours. See id. at 412–413. He also opined that Diaz was severely limited in her ability to, inter alia, reach overhead, finger, push, pull, lift, bend, squat, and kneel. See id. at 413–415.

Dr. Tirado completed two medical source statements on Diaz's mental health, one in September 2014 and another in December 2015. See Pl.'s Statement of Facts at 24, 25. In these statements, he listed a variety of symptoms caused by Diaz's

4

depression, including anhedonia, decreased energy, difficulty thinking or concentrating, easy distractibility, feelings of guilt or worthlessness, persistent disturbances of mood or affect, and memory impairment. <u>See</u> R. at 418–491, 730. He further opined that Diaz's mental health impairments significantly limited her ability to function, including by impairing her ability to remember work-like procedures, to understand and remember instructions, to maintain attention and concentration for extended periods, to make simple work-related decisions, to interact appropriately with the general public, to get along with coworkers, and to respond appropriately to changes in the work setting. <u>See</u> <u>id.</u> at 420–422, 731–732. While noting that Diaz's mental impairments would likely produce both "good days" and "bad days," Dr. Tirado estimated that Diaz would miss work more than 3 times a month as a result of her depressive disorder. <u>See</u> <u>id.</u> at 422.

Two state agency medical consultants, Dr. Maria Lorenzo ("Dr. Lorenzo") and Dr. Thomas Hill ("Dr. Hill"), came to different conclusions about the severity of Diaz's limitations. <u>See</u> Def.'s Mem. at 8, 9. These two medical consultants did not personally examine Diaz. <u>See</u> <u>id.</u>; <u>see</u> <u>also</u> R. at 22, 23. Instead, they based their opinions primarily on the treating notes from Dr. Formica and Dr. Tirado and on Diaz's written responses to the activities of daily living questionnaire. <u>See</u> R. at 78–85. On the basis of her review of the paper record, Dr. Lorenzo opined that Diaz could, <u>inter</u> <u>alia</u>, (1) stand or walk for six hours in an eight-hour workday; (2) occasionally climb ramps, stairs, ladders, ropes, and scaffolds; (3) occasionally balance, stoop, kneel, crouch, and crawl; and (4) frequently reach overhead with both arms and finger with both hands. <u>See</u> <u>id.</u> at 83, 84. Dr. Hill opined that Diaz's psychologically based symptoms moderately limited her ability to complete a normal workday and workweek, but that she

was not significantly limited in, <u>inter alia</u>, (1) carrying out short and simple instructions; (2) maintaining attention and concentration for extended periods; (3) sustaining an ordinary routine without special supervision; (4) working in coordination with or in proximity to others without being distracted by them; and (5) making simple work-related decisions. <u>See id.</u> at 85.

## IV. STANDARD OF REVIEW

Under section 405(g) of title 42 of the United States Code, it is not the court's role to review <u>de novo</u> the ALJ's decision as to whether the claimant was disabled. <u>See</u> <u>Schaal v. Apfel</u>, 134 F.3d 496, 501 (2d Cir. 1998). Instead, "[a] district court may set aside the Commissioner's determination that a claimant is not disabled only if the factual findings are not supported by substantial evidence or if the decision is based on legal error." <u>Burgess v. Astrue</u>, 537 F.3d 117, 127 (2d Cir. 2008) (internal quotation marks omitted). Although substantial evidence requires "more than a mere scintilla," it is a "very deferential standard of review." <u>Brault v. Soc. Sec. Admin., Comm'r</u>, 683 F.3d 443, 447–48 (2d Cir. 2012). The standard requires "such <u>relevant</u> evidence as a <u>reasonable</u> mind might accept as adequate to support a conclusion." <u>Id.</u> at 448 (emphasis in original). If the Commissioner's findings of fact are supported by substantial evidence, those findings are conclusive, and the court will not substitute its judgment for the Commissioner's. 42 U.S.C. § 405(g) (2016); <u>see also</u> <u>Yancey v. Apfel</u>, 145 F.3d 106, 111 (2d Cir. 1998).

## V. DISCUSSION

Diaz argues that the ALJ's Decision should be reversed or remanded for three primary reasons. First, she argues that the ALJ failed to properly apply the treating physician rule when determining Diaz's residual functional capacity. <u>See</u> Pl.'s Mem. at

6

1–14.  Second, she argues that the ALJ's determination that Diaz could perform work

that exists in substantial numbers in the national economy was not supported by

substantial evidence.  See id. at 14–22.  Third, she argues that the ALJ improperly

discounted Diaz's testimony concerning her pain and other symptoms.  See id. at 22–

24.

A.      Treating Physician Rule

"The SSA recognizes a treating physician rule of deference to the views of the

physician who has engaged in the primary treatment of the claimant."[2]  Green-Younger

v. Barnhart, 335 F.3d 99, 106 (2d Cir. 2003) (internal quotation marks omitted).  Under

this rule, "the opinion of a claimant's treating physician as to the nature and severity of

the impairment is given controlling weight so long as it is well-supported by medically

acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the

other substantial evidence in the case record."  Burgess, 537 F.3d at 128 (internal

quotation marks and alterations omitted).

In this case, the ALJ improperly discounted the opinions prepared by Diaz's two

treating physicians, Dr. Formica and Dr. Tirado.  In deciding to accord "little weight" to

Dr. Formica's opinion, the ALJ explained that "[t]he positive objective signs [Dr.

Formica] reported and the limitations he placed on the claimant's ability to sit, stand and

walk in his medical source statement are out of proportion to his observations of the

_____

[2] While the regulation governing the treating physician rule has been amended, the amended
version does not apply to this case, as Diaz filed for disability benefits before the amendments became
effective on March 27, 2017.  See 82 Fed. Reg. 5,844 (Jan. 18, 2017), 2017 WL 168819.

claimant and the physical examination findings in his overall treatment records, which stated that she had episodic arthralgias."[3]  R. at 22, 23.  The ALJ further noted:

> While the claimant complained of joint pain, the treatment records from Dr. Formica reported that physical examination findings included no evidence of swelling, joint warmth, erythema, or active synovitis.  He reported that she had excellent handgrip, negative findings in the hips, ankles and feet, normal gait, normal range of motion and normal motor strength in the bilateral upper and lower extremities.  Moreover, Dr. Formica based his opinion, in part, upon medication side effects which were denied in the contemporaneous medical record.

Id. at 23.

This analysis is problematic because it ignores and mischaracterizes key findings in Dr. Formica's treatment notes.  As courts in this circuit have consistently held, an ALJ's decision to discount a treating physician's opinion is not supported by substantial evidence where, as here, the ALJ has neglected to consider evidence in the record that is consistent with the treating physician's opinion.  See, e.g., Nusraty v. Colvin, 213 F. Supp. 3d 425, 439 (E.D.N.Y. 2016) ("[T]he ALJ's conclusion that [the treating physician's] opinion is inconsistent with his own notes and with the medical record is not supported by substantial evidence because the ALJ failed to consider the evidence in the record that is consistent with [his] opinion."); Johnston v. Colvin, No. 13–CV–00073, 2014 WL 1304715, at *3 (D. Conn. Mar. 31, 2014) (The ALJ erred by "recount[ing] only those aspects of the opinion that were inconsistent with the weight of the [evidence] . . . and neglect[ing] to acknowledge objective medical evidence in the record that did

---

[3] A medical source statement is an evaluation from a treating physician or consultative examiner of "what an individual can still do despite a severe impairment, in particular about an individual's physical or mental abilities to perform work-related activities on a sustained basis."  Hooper v. Colvin, 199 F. Supp. 3d 796, 812 (S.D.N.Y. 2016) (quoting SSR 96-5p).

support [the treating physician's] opinion"); <u>Selian v. Astrue</u>, 708 F.3d 409, 418 (2d Cir. 2013) ("The ALJ erred in its treatment of [the treating physician's] opinion [by] . . . misconstru[ing] the record."); <u>Arias v. Astrue</u>, 11–CV–1614, 2012 WL 6705873, at *2 (S.D.N.Y. Dec. 21, 2012) ("The ALJ may not simply ignore contradictory evidence.").

For example, while ALJ Borré stated that the physical examination findings in Dr. Formica's treatment notes included no evidence of swelling or joint warmth, <u>see</u>, <u>e.g.</u>, R. at 23, Dr. Formica's notes from July 13, 2014, expressly mention pain, warmth, and swelling in Diaz's right knee.  <u>See id.</u> at 342.  Similarly, the ALJ's Decision cites to portions of the treatment notes indicating that Diaz had a "normal range of motion," <u>id.</u> at 23, but it fails to acknowledge other notes documenting Diaz's pain associated with such motion.  <u>See id.</u> at 350 ("The pain is made worse by range of motion of the cervical spine[.]"); <u>id.</u> at 359 ("The joint exam revealed present discomfort with range of motion of the shoulders bilaterally . . . ."); <u>id.</u> at 433 ("Joint exam revealed the cervical spine has full range of motion, although when placed in left lateral flexion with slight extension[,] the patient has the almost immediate onset of a burning sensation which radiates to the left shoulder and proximal forearm.").  The ALJ stated that "[a] review of the overall record revealed that [Diaz] experienced intermittent flares affecting her wrists, shoulders, small joints of the hands and her knees, which resolved with adjustments to her medications."  <u>Id.</u> at 18.  However, he failed to acknowledge that Diaz continued to experience arthritic pains and problems after Dr. Formica made multiple adjustments in Diaz's treatment plan.  <u>Compare id.</u> at 360 (deciding on December 2, 2013, to "increase [Diaz's] Celebrex to 200 mg twice a day") <u>with id.</u> at 350, 352 (noting on March 7, 2014, Diaz's persistent pain and administering a steroid

injection).  Indeed, even when Dr. Formica documented improvements in Diaz's health, he also often noted her continuing joint pain.  <u>See</u>, <u>e.g.</u>, <u>id.</u> at 346 (reporting both "joint pain located in small joints of the hand" and that Diaz is "feeling quite well").

To be clear, an ALJ need not explicitly discuss every piece of evidence in the record.  <u>See Brault</u>, 683 F.3d at 448.  Here, however, the ALJ appears to have selectively disregarded contradictory evidence that directly undermines the bases of his no-disability determination.  Particularly in light of his RFC determination that Diaz could occasionally climb stairs, kneel, crouch, and crawl, the ALJ should have discussed or at least acknowledged that, as early as July 13, 2014, Dr. Formica told Diaz to "avoid <u>any</u> kneeling[,] squatting[,] or stairs."  R. at 369 (emphasis added).  Other omissions are similarly noteworthy in light of the ALJ's vocational analysis.  Specifically, during the ALJ hearing, vocational expert Matzilevich opined that there would be available work for Diaz in the national economy <u>if</u> she could frequently reach overhead and finger bilaterally, but that there would be no available work for Diaz if she could only <u>occasionally</u> reach overhead and finger bilaterally.  <u>See id.</u> at 59–61.  As noted above, the ALJ ultimately determined that Diaz's RFC allowed her to frequently reach overhead and finger bilaterally.  <u>See id.</u> at 20.  Thus, given that Diaz's disability status appeared to turn on whether she could frequently, as opposed to only occasionally, reach overhead and finger bilaterally, it was especially important for the ALJ to have confronted and discussed evidence in the record that was consistent with the limitations that Dr. Formica placed on Diaz's ability to reach overhead and finger bilaterally.  <u>See id.</u> at 413 (opining that Diaz can "never" reach overhead or finger); <u>cf.</u> <u>Anderson v. Colvin</u>, No. 15-CV-6720 (PKC), 2017 WL 1166350, at *9 (E.D.N.Y. Apr. 3, 2017)

("Particularly in light of the [vocational expert's] finding that a person with Plaintiff's characteristics who 'had no useful ability to interact with others,' would not be able to work, the ALJ was required to explain why he did not credit [the treating physician's] finding regarding Plaintiff's 'limited to no social interaction.'"). Nevertheless, the ALJ's Decision failed to discuss several pieces of supporting evidence, including (1) Diaz's persistent carpal tunnel syndrome symptoms in both hands, which Dr. Formica linked to Diaz's difficulty with finger manipulations, see id. at 413; and (2) steroid injections that Diaz received in early 2014, after complaining of neck and shoulder pain, see id. at 352, 357.

The ALJ's decision to give "some weight" to Dr. Tirado's medical opinions is also unsupported by substantial evidence. Id. at 24. As with Dr. Formica's medical source statement, the ALJ found that Dr. Tirado's opinions that Diaz had marked and extreme functional limitations were not supported by his treatment records. See id. at 24. In his Decision, the ALJ summarized Dr. Tirado's treatment records as "reveal[ing] that the claimant experienced intermittent periods of increased depression with irritability, easy distraction, mild diffuse memory loss and anhedonia." Id. at 23. The ALJ drew particular attention to periods of time when Diaz reported good or improved mental health. See, e.g., id. at 24. He further stated that "[t]he treatment records showed that the claimant's symptoms were exacerbated by stress and arthritic pain, but the psychiatrist observed that with medication compliance, her short and long-term memory was intact and she reported not attentional problems." Id. at 24.

It is unclear from the Decision whether the ALJ believed that Diaz's memory and attention problems could be fully managed with proper medication compliance.

However, to the extent that the ALJ drew such an inference from Dr. Tirado's notes, he improperly "substitute[d] his own expertise or view of the medical proof for the treating physician's opinion. Shaw v. Chater, 221 F.3d 126, 134 (2d Cir. 2000). While Dr. Tirado's treatment records do show periods of both good mental health and good compliance with medication, see, e.g., R. at 312, they also reveal periods of time when Diaz's mental health worsened notwithstanding her compliance with medication. See id. at 395 (noting that Diaz's "[c]ompliance with medication is good," but that "[she] is not doing well and is worse" and that she suffers from "[d]iffuse memory loss for recent and remote events"). Nowhere does Dr. Tirado state that Diaz's attentional and memory problems can be fully addressed through proper compliance with her medications.

More importantly, the ALJ's observations about Diaz's symptoms do not necessarily contradict Dr. Tirado's opinions about Diaz's work-related limitations because they address different, albeit related, topics. In particular, it is not evident to the court why "mild diffuse memory loss," "easy distraction," and "anhedonia" are incompatible with Dr. Tirado's opinion that Diaz is significantly impaired in her ability to function in a work environment. Cf. Anderson, 2017 WL 1166350, at *9 (noting that observations that "Plaintiff was alert and oriented, that his memory and judgment were not impaired, and that Plaintiff could care for himself" were not inconsistent with, inter alia, "extreme limitations in the ability to make judgments on simple work-related decisions, in his ability to understand, remember, and carry out complex instructions, in his ability to make judgments on complex work-related decisions, and in his ability to respond appropriately to usual work situations and to changes in a routine work setting."). While there are instances where a patient's documented symptoms obviously

conflict with the treating physician's recommended work limitations, this case is not one of them. See, e.g., Michels v. Astrue, 297 F. App'x 74, 75–76 (2d Cir. 2008) (physician's reports alternated between finding that the claimant was "totally disabled" and that she could perform "a wide range of work at the light exertional level"); Morgan v. Colvin, No. 15-CV-2823 (RRM), 2016 WL 5477593, at *9 (E.D.N.Y. Sept. 29, 2016) (treating physician first found that claimant was "capable of lifting ten pounds and walking for two hours," and then reported two days later that "she could not lift more than five pounds or walk more than twenty yards"). Likewise, the intermittency of Diaz's health problems does not preclude findings of severe, work-related limitations. Although the ALJ documents in detail those period of time where Diaz experienced good or improved health, see R. at 21–24, courts have recognized that intermittent health problems can nevertheless significantly impair a person's capacity to work. See McKissick v. Barnhart, No. 01 CV 1550 (JG), 2002 WL 31409933, at *13 (E.D.N.Y. Sept. 30, 2002) (finding that the ALJ erred in believing that the intermittency of the claimant's arthritic symptoms precluded a finding of permanent disability); Chukman v. Apfel, No. 98-CV-4900 (JG), 1999 WL 890902, at *6 (E.D.N.Y. Sept. 24, 1999) (noting that "an intermittent disorder" might still be of "sufficient seriousness to limit one's ability to work for a continuous period [of time]").

Furthermore, even if the court agreed with the ALJ that Dr. Formica's and Dr. Tirado's opinions were not supported by substantial evidence, it would nonetheless remand this case because the ALJ failed to adequately explain his reasons for assigning "little" or "some" weight to these treating physician opinions. "In order to override the opinion of the treating physician, [courts] have held that the ALJ must

explicitly consider, <u>inter alia</u>: (1) the frequently, length, nature, and extent of treatment; (2) the amount of medical evidence supporting the opinion; (3) the consistency of the opinion with the remaining medical evidence; and (4) whether the physician is a specialist." <u>Selian v. Astrue</u>, 708 F.3d 409, 418 (2d Cir. 2013); <u>see also</u> 20 C.F.R. § 404.1527(c). Furthermore, the ALJ's consideration of these factors must be evident from the ALJ's decision, as the claimant is entitled to an explanation as to why the ALJ did not credit the findings of a treating physician. <u>See</u> <u>Elliott v. Colvin</u>, No. 13-CV-2673 MKB, 2014 WL 4793452, at *15 (E.D.N.Y. Sept. 24, 2014) ("The ALJ is not required to explicitly discuss the factors, but it must be clear from the decision that the proper analysis was undertaken."); <u>Gunter v. Comm'r of Soc. Sec.</u>, 361 F. App'x 197, 199 (2d Cir. 2010) ("Before an ALJ may elect to discredit the medical conclusions of a treating physician, she must explicitly consider" the factors specified in the regulation.). Accordingly, remand is appropriate when the ALJ fails to "comprehensively set forth his reasons for the weight assigned to a treating physician's opinion." <u>Burgess</u>, 537 F.3d at 129–130 (quoting <u>Halloran v. Barnhart</u>, 362 F.3d 28, 33 (2d Cir. 2004)) (internal alterations omitted).

In this case, the ALJ failed to address many of the factors that he was required to consider. Most notably, his Decision did not acknowledge, much less discuss, that Dr. Tirado and Dr. Formica each saw Diaz every six weeks since the alleged onset of disability. <u>See</u> R. at 410, 417. The fact that Dr. Formica has treated Diaz for over 20 years was also notably absent from the ALJ's analysis. <u>See</u> <u>id.</u> at 410. Indeed, there is no indication that the ALJ considered frequency or length of treatment at all in his decision to assign Diaz's treating physicians less than controlling weight, even though

SSA regulations provide that "generally, the longer a treating source has treated the claimant and the more times the claimant has been seen by a treating source, the more weight the Commissioner will give to the source's medical opinion." Burgess, 537 F.3d at 129 (quoting 20 C.F.R. § 404.1527(d)(2)(i), now codified at 20 C.F.R. § 404.1527(c)(2)) (internal alterations omitted). In addition, the court cannot ascertain whether the physician's specialization factored into the ALJ's analysis. This omission is particularly glaring in light of the ALJ's decision to afford "little weight" to Dr. Formica's rheumatoid arthritis opinion and "great weight" to Dr. Lorenzo's rheumatoid arthritis opinion, even though Dr. Formica is a board certified rheumatologist while Dr. Lorenzo is not. See R. at 18, 22.

For similar reasons, the ALJ erred to the extent that he accorded "little" or "some" weight to the treating physicians' opinions on the basis of the non-treating physician opinions contained in the Record. While the opinions of non-examining or non-treating physicians can override the opinions of treating physicians in some cases, see Diaz v. Shalala, 59 F.3d 307, 313 n.5 (2d Cir.1995), courts in this circuit generally "disfavor[ ] opinions rendered after limited to no contact with the claimant." Flynn v. Comm'r of Soc. Sec. Admin., 729 F. App'x 119, 121 (2d Cir. 2018); see also LaFerrera o/b/o M.J.S. v. Comm'r of Soc. Sec., 247 F. Supp. 3d 308, 324 (E.D.N.Y. 2017) ("The opinion of a consultative physician, who only examined a Plaintiff once, should not be accorded the same weight as the opinion of a Plaintiff's treating physician.") (internal quotation marks and alterations omitted); Cabreja v. Colvin, No. 14-CV-4658 VSB, 2015 WL 6503824, at *30 (S.D.N.Y. Oct. 27, 2015) ("[I]t is presumed that in a conflict of views between a treating doctor and a onetime consultant, the conflict should be resolved in favor of the

treating physician."). This presumption against the opinions of non-treating doctors is rooted in the logic of the treating physician rule, which gives more weight to treating physicians because "these sources are likely to be the medical professionals most able to provide a detailed, longitudinal picture of [the claimant's] medical impairment(s) and may bring a unique perspective to the medical evidence that cannot be obtained from the objective medical findings alone or from reports of individual examinations, such as consultative examinations or brief hospitalizations." 20 C.F.R. § 404.1527(c)(2); see also Nazario v. Berryhill, No. 16CV01091NSRPED, 2018 WL 3475471, at *5 (S.D.N.Y. July 18, 2018). Accordingly, "an ALJ is not permitted to credit [a] consultative opinion without comprehensively setting forth good reasons." Anderson, 2017 WL 1166350, at *10 (internal quotation marks and alterations omitted).

Here, the ALJ's rationale for assigning weight to the opinions of non-treating physicians was far from comprehensive. In justifying his decision to give "some weight" to the opinions of PA Robbins and Dr. Belniak, the ALJ simply observed that their opinions were consistent with the overall medical record. See R. at 23. However, an ALJ cannot override the opinion of a treating physician on the basis of such conclusory reasoning. See Cabrera v. Comm'r of Soc. Sec., No. 16CIV4311ATJLC, 2017 WL 3686760, at *4 (S.D.N.Y. Aug. 25, 2017) (collecting cases). The ALJ's decision to credit the state agency medical consultants is similarly lacking in reason. The ALJ provided no justification at all for his decision to accord "greater weight" to Dr. Hill's assessment of Diaz's mental health. See R. at 23 (summarizing Dr. Hill's opinions, but not explaining why these opinions merit greater weight). In justifying his decision to give "great weight" to Dr. Lorenzo's opinions on Diaz's arthritis, the ALJ explained that "she

provided specific reasons for her opinions about the claimant's residual functional capacity showing that her opinions were grounded in the evidence in the case record including careful consideration of treating source opinions and the claimant's allegations about her symptoms and limitations." Id. at 22. This justification relies on the same conclusory reasoning discussed above. See supra at 16. It is also factually inaccurate, as both Dr. Lorenzo and Dr. Hill clearly indicated that they did not review "opinion evidence from any source." See id. at 86; see also id. at 82 ("There is no indication that there is medical or other opinion evidence.").

Accordingly, the court vacates the ALJ's Decision and remands the case for proper application of the treating physician rule. See Halloran, 362 F.3d at 33 ("[Courts] do not hesitate to remand when the Commissioner has not provided 'good reasons' for the weight given to a treating physician's opinion and [courts] will continue remanding when [they] encounter opinions from ALJs that do not comprehensively set forth reasons for the weight assigned to a treating physician's opinion."). Assuming that ALJ Borré's apparent concerns about inconsistencies between the treating physicians' opinions and their treatment notes are well-founded, the court also reminds the ALJ of his affirmative duty to develop the record. See Tejada v. Apfel, 167 F.3d 770, 774 (2d Cir. 1999) ("It is the rule in our circuit that the ALJ, unlike a judge in a trial, must affirmatively develop the record in light of the essentially non-adversarial nature of a benefits proceeding, even if the claimant is represented by counsel.") (internal quotation marks and alterations omitted). To properly discharge this duty, "an ALJ cannot reject a treating physician's diagnosis without first attempting to fill any clear gaps in the administrative record.'" Burgess, 537 F.3d at 129 (quoting Rosa v. Callahan, 168 F.3d

72, 79 (2d Cir.1999)).  Similarly, an ALJ's failure to seek clarification of perceived inconsistencies in a treating physician's findings may constitute legal error.  See Rolon v. Comm'r of Soc. Sec., 994 F. Supp. 2d 496, 504 (S.D.N.Y. 2014) ("A perceived internal inconsistency about a critical finding is a conflict or ambiguity which requires the ALJ to further develop the record by seeking additional evidence or clarification from the treating physician.") (internal quotation marks and alterations omitted).

      B.    Credibility Determination

The ALJ also erred by failing to properly evaluate Diaz's subjective complaints of pain when determining her residual functional capacity.  "It has long been the law of this Circuit that 'the subjective element of pain is an important factor to be considered in determining disability.'"  Connors v. Connecticut Gen. Life Ins. Co., 272 F.3d 127, 136 (2d Cir. 2001) (quoting Mimms v. Heckler, 750 F.2d 180, 185 (2d Cir.1984)).  Thus, "[w]hen determining a claimant's RFC, the ALJ is required to take the claimant's reports of pain and other limitations into account[.]"  Genier v. Astrue, 606 F.3d 46, 49 (2d Cir. 2010) (citing 20 C.F.R. § 416.929).  In doing so, however, "[the] ALJ has discretion to evaluate the credibility of a claimant and to arrive at an independent judgment, in light of medical findings and other evidence, regarding the true extent of the pain alleged by the claimant."  Marcus v. Califano, 615 F.2d 23, 27 (2d Cir. 1979).

When assessing the credibility of a claimant's subjective testimony on pain, the ALJ must consider the factors outlined in Social Security Ruling (SSR) 96-7p,[4] namely: (1) daily activities; (2) location, duration, frequency, and intensity of pain or other

---

[4] SSR 96-7p was superseded by SSR 16-3p on March 28, 2016, after the ALJ denied Diaz's application for disability benefits.

symptoms; (3) precipitating and aggravating factors; (4) type, dosage, effectiveness, and side effects of medication; (5) treatment other than medication used for relief of pain or other symptoms; (6) any measures used to relieve pain or other symptoms; and (7) other factors concerning functional limitations and restriction due to pain or other symptoms. See Grint v. Comm'r of Soc. Sec., No. 15-CV-6592 (KAM), 2018 WL 1902335, at *19 (E.D.N.Y. Apr. 20, 2018); Pino v. Berryhill, No. 3:17CV26 (AWT), 2018 WL 1419793, at *2 (D. Conn. Mar. 22, 2018). The ALJ's credibility determination must be "based on a consideration of all of the evidence in the case record," and it must also provide "specific reasons for the finding on credibility . . . and must be sufficiently specific to make clear to the individual and to any subsequent reviewers the weight the adjudicator gave to the individual's statements and the reasons for that weight." SSR 96–7p; see also Morseman v. Astrue, 571 F. Supp. 2d 390, 396 (W.D.N.Y. 2008).

In this case, the ALJ's credibility determination lacked the required specificity. To begin, the court cannot determine whether the ALJ appropriately weighed Diaz's subjective pain because the ALJ failed to identify the weight, if any, afforded to Diaz's testimony. While the ALJ found that Diaz's testimony was "not entirely credible," he did not explain how this credibility determination affected his weighing of Diaz's subjective pain when determining her RFC. See R. at 21–22. Furthermore, it not clear from the Decision that the ALJ considered the entire record when assessing Diaz's credibility. While the ALJ discusses the treating physicians' notes, Diaz's testimony at the hearing, and Diaz's answers to the activities of daily living questionnaire, his credibility analysis neglects to mention the medical source statements from Diaz's two treating physicians. See id. This omission is noteworthy, both because the opinions from Diaz's treating

physicians support her claims of severe pain, see, e.g., id. at 410–11, and because Social Security regulations specifically direct ALJs to consider the "[d]iagnosis, prognosis, and other medical opinions provided by treating or examining physicians or psychologists and other medical sources." SSR 96–7p. The ALJ also neglected to mention Diaz's long-history of pain medication and treatment, as documented in her treating physicians' medical records, even though the SSR 96–7p expressly directs him to do so. See, e.g., R. at 343 (prescribing 50 mg of tramadol for pain); id. at 429 (same). While the ALJ need not always give exhaustive explanations for each of SSR 96–7P's factors, the ALJ's omissions in this case raise significant doubt as to whether he considered the entire record when rendering his credibility determination. Cf. Hall v. Astrue, 677 F. Supp. 2d 617, 632 (W.D.N.Y. 2009) (ALJ's failure to mention plaintiff's medication history or medical source statements that supported plaintiff's credibility "rais[ed] doubt as to whether the entire record was considered[.]"). Given that the court already remands this case for proper application of the treating physician rule, the court also directs the ALJ to explain his credibility determination "with sufficient specificity to enable the Court to decide whether there are legitimate reasons for the ALJ's disbelief and whether his decision is supported by substantial evidence." Brandon v. Bowen, 666 F. Supp. 604, 608 (S.D.N.Y. 1987).

  C. Vocational Analysis

   Finally, Diaz advances four arguments for why the ALJ's determination that Diaz could perform work that exists in substantial numbers in the national economy was not supported by substantial evidence. See Pl.'s Mem. at 14–22. First, she argues that the ALJ improperly disregarded the vocational analysis prepared by Raymond Cestar

("Cestar"), a vocational expert.  See id. at 14–15.  Cestar's written report to the ALJ

found that "Diaz is presently unemployable at any occupation."  R. at 153.  Second,

Diaz argues that the ALJ erred by relying on testimony from vocational expert

Matzilevich.  See Pl.'s Mem. at 15.  Specifically, Diaz's attorney raised objections to

Matzilevich's qualifications as a vocational expert and to the reliability of Matzilevich's

methodology, both of which the ALJ overruled at the hearing.  See R. at 56.  Third, Diaz

argues that the jobs that Matzilevich testified were available to Diaz did not constitute "a

significant number of jobs."  See Pl.'s Mem. at 18.  Fourth, Diaz argues that the ALJ's

vocational analysis is unsupported by substantial evidence because his RFC

determination is not supported by substantial evidence.  See Pl.'s Mem. at 20.

The court need not reach the merits of these claims because reconsideration of

Diaz's subjective pain and her treating physicians' opinions may change the ALJ's RFC

determination.  In particular, any change to the RFC would almost certainly moot the

precise arguments raised in Diaz's third and fourth claims.  However, having reviewed

the Record and the parties' arguments, the court briefly addresses Diaz's first two

claims, as the ALJ may face these issues again upon reconsidering his decision.

Regarding Diaz's first argument, the court concludes that the ALJ properly

disregarded Cestar's vocational analysis.  Cestar did not base his vocational analysis

on the ALJ's RFC determination.  See R. at 293–94.  Instead, he made his own

independent assessment of Diaz's RFC based on his own review of the medical

evidence.  See id.  In doing so, Cestar overstepped the role of the vocational expert,

which is "to assist the ALJ in determining what jobs Plaintiff can perform based on the

RFC, not to determine the RFC."  Tompkins v. Colvin, No. 13CV911, 2015 WL

10382575, at *7 (W.D.N.Y. Dec. 23, 2015), report and recommendation adopted, No. 13-CV-911, 2016 WL 792428 (W.D.N.Y. Mar. 1, 2016); see also HALLEX I-2-6-74(C) ("The ALJ will not permit the [vocational expert] to respond to questions on medical matters or to draw conclusions not within the [vocational expert's] area of expertise.  For example, the [vocational expert] may not provide testimony regarding the claimant's residual functional capacity . . . .").  Therefore, the ALJ correctly ignored Cestar's vocational analysis, which was rendered defective by Cestar's improper reliance on his own medical determination of Diaz's RFC.

The court also concludes that Diaz's objections to Matzilevich's qualifications and methodology lack merit.  Matzilevich's resume, which the ALJ properly admitted into the record, shows that he has significant relevant experience and education.  See R. 295–97.  For example, since 2011, Matzilevich has been vetted and employed by SSA as a vocational expert.  See R. at 295; HALLEX I-2-1-31 (outlining SSA's procedures for vetting and hiring vocational experts).  Before then, he worked as a Vocational Rehabilitation Counselor for the State of Maine's Department of Labor.  See R. at 295.  During the ALJ hearing, Matzilevich identified several sources of data that he relied upon to determine job availability in the economy, including the U.S. National Long-Term Employment Outlook, the Dictionary of Occupational Titles, and his personal experience as a Rehabilitation Counselor.  See id. at 60, 62.  When cross-examined by Diaz's attorney, Matzilevich further testified that his methodology was similar to the vocational analysis methods employed by other groups, such as SkillTRAN and Job Browser Pro.  See id. at 61, 62.  While Matzilevich may not have provided the clearest description of the individual steps of his methodology, the court cannot agree with Diaz

that Matzilevich's testimony was "incomprehensible gibberish."  <u>See</u> Pl.'s Mem. at 18.

Instead, the court concludes that there was a sufficient basis for the ALJ to accept

Matzilevich's testimony as reliable.  <u>Cf.</u> <u>Jones-Reid v. Astrue</u>, 934 F. Supp. 2d 381, 407

(D. Conn. 2012), <u>aff'd</u>, 515 F. App'x 32 (2d Cir. 2013) ("While the [vocational expert] did

not provide a step-by-step description of the methodology used, this Court cannot say

that the ALJ erred in accepting the VE's testimony as reliable[.]"); <u>Galiotti v. Astrue</u>, 266

F. App'x 66, 68 (2d Cir. 2008) (affirming the ALJ's acceptance of the vocational expert's

testimony as reliable, even though the expert "was unable to specify how he arrived at

the number of jobs available in the economy").

## VI.    CONCLUSION

For the reasons stated above, Diaz's Motion to Reverse the Decision of the

Commissioner (Doc. No. 22) is **GRANTED**, and the Commissioner's Motion to Affirm

the Decision of the Commissioner (Doc. No. 23) is **DENIED**.  The case is remanded to

the ALJ for proceedings consistent with this Ruling.  The Clerk's Office is instructed that,

if any party appeals to this court the decision made after this remand, any subsequent

social security appeal is to be assigned to the District Judge who issued this Ruling.

**SO ORDERED.**

Dated at New Haven, Connecticut this 18th day of September, 2018.


/s/ Janet C. Hall _____
Janet C. Hall
United States District Judge